COMMONWEALTH *vs.* RICHARD DE VINCENT.

Middlesex.   December 8, 1970. — January 28, 1971.

Present: TAURO, C.J., SPALDING, CUTTER, REARDON, & QUIRICO, JJ.

*Extortion. Practice, Criminal,* Motion for exculpatory evidence, Failure
to raise point in trial court. *Pleading, Criminal,* Indictment or com-
plaint. *Words,* "Crapped out."

Upon appeal in a criminal case, the meager record with respect to a mo-
tion for exculpatory evidence, which the Commonwealth represented
to this court it did not have, disclosed no error in the denial of the
motion "after hearing." [593–594]
A threat and a demand for payment of a certain sum within a definite
time, and, after the passage of that time without payment of the
sum, a threat and a demand for payment of the sum by a specified
day following, were separate and distinct offences, and an indict-
ment for attempted extortion properly charged each offence in a
separate count. [594–595]
Evidence at the trial of an indictment for attempted extortion, that on
a certain day the defendant and a "big bald-headed man [who]
looked like a wrestler" met with the victim in the defendant's auto-
mobile, that the bald-headed man was silent but that the defendant
told the victim to pay a certain sum within ten days and that if he
did not he would have "crapped out," warranted conviction of the de-
fendant on a count pertaining to that day [595–596]; and evidence
that on a certain day later the defendant told the victim by telephone
he was coming to his home and did so and was accompanied by the
bald-headed man, who threatened the victim and demanded the
money, warranted conviction of the defendant on a count pertaining
to the later day, even though he was silent while at the victim's
home   [596].
A contention that there was a variance between the proof at the trial
of an indictment and particulars, made by the defendant for the
first time in this court, was not considered. [596–597]

INDICTMENT found and returned in the Superior Court on
January 14, 1969.

The case was tried before *McLaughlin,* J.

*David Berman* (*Ronald J. Chisholm* with him) for the de-
fendant.

*Terence M. Troyer,* Legal Assistant to the District At-
torney, for the Commonwealth.

SPALDING, J.   This is an appeal under G. L. c. 278, §§ 33A–
33G, from convictions under an indictment in two counts
charging attempted extortion.

There was evidence on which the jury could have found
the following: On October 22, 1968, the date of the offence
charged in the first count, the defendant and another man,
described as a "big, bald-headed man [who] looked like a
wrestler," met with John Najarian in the defendant's auto-
mobile.   The defendant asked Najarian if he knew Lou
Ricci, and Najarian replied he did.   The defendant then
said, "Lou Ricci says you owe him $4,000," that the de-
fendant wanted Najarian to pay it within ten days, and
that if Najarian did not he would have "crapped out."   The
bald-headed man said nothing.

On November 1, the defendant accompanied by the bald-
headed man came to Najarian's house, but left without
speaking to Najarian.   On the evening of November 2, the
date of the offence charged in the second count, the de-
fendant telephoned Najarian and said, "I thought you were
in New York.   You . . . , I'm coming right up.   I'll be
there in fifteen minutes."   About fifteen minutes later, the
defendant and the bald-headed man arrived at Najarian's
house.   In Najarian's living room, the defendant sat on the
couch about ten feet from Najarian with his hands on his
lap, while the bald-headed man stood about two feet from
Najarian, bent over and snarled at him, and asked him if
he had the money.   He said he would cut out Najarian's
tongue and shove it up his rectum and would put dynamite
up Najarian's rectum and blow him up.

1. The defendant first argues that his motion for ex-
culpatory evidence should have been allowed.[1]   The defend-
ant's motion for exculpatory evidence was denied "after
hearing."   What was said or offered at the hearing, either
in support of or in opposition to the motion, the record does

---

[1] The motion asked that the defendant be furnished "with all evidence of
an exculpatory nature within the possession, custody, control or within the
knowledge of the prosecuting officer during the pendency of all matters in
regard thereto."

not disclose.   The Commonwealth asserts in its brief that
it represented to the court that it had no such evidence.
The defendant denies this in his brief.   At all events, the
Commonwealth now represents that it never had and does
not now have in its possession, custody, or control, or within
the knowledge of any prosecuting officers, any evidence of
an exculpatory nature.   On the basis of the meager record
with respect to this motion, we are unable to say that the
judge erred in denying it.   See *United States* v. *Keogh,* 391 F.
2d 138, 146–148 (2d Cir.); *United States* v. *Wolfson,* 289 F.
Supp. 903, 914–915 (S. D. N. Y.).

2. The defendant next argues that he was entitled to
directed verdicts because the offence should have been
charged in one count instead of two.   He contends that his
crime was a "continuing offense" and therefore constituted
one crime only.   In support of this contention he cites
*Commonwealth* v. *Stasiun,* 349 Mass. 38, to the effect that
"The test of single intent or general scheme is just as ap-
propriate for the crime of soliciting bribes as it is for larceny.
Solicitation of a bribe may take the form of protracted
negotiations.   An offer to give or accept a bribe, while it
is outstanding, has a continuing effect." *Id.* at 45.   The
defendant urges that "this logic is equally . . . applicable
to extortion as to bribery, perhaps more so."   What the de-
fendant overlooks is the following paragraph of that opinion
where we said: "[S]eparate solicitations could, as is well
established, be charged as separate offences."   It is this lan-
guage that we find equally applicable to extortion as to
bribery.

The Commonwealth offered evidence that on two separate
occasions the defendant threatened Najarian and demanded
payment of money from him.   Each threat and demand
was separable.   On October 22, the defendant threatened
Najarian and demanded payment within ten days.   Ten
days passed and Najarian did not pay.   Having thus failed
in his first attempt, the defendant returned on November 2
to issue a new threat.   This time he demanded that Najarian
have the money by the following Monday night.   There

were two distinct deadlines for payment and two distinct
threats. These were, therefore, separate and distinct of-
fences which could be separately charged. *Commonwealth* v.
*Mannos*, 311 Mass. 94, 113 (each acceptance of bribe consti-
tutes a separate offence). *Commonwealth* v. *Beal*, 314 Mass.
210, 226 (same).

3. The defendant further contends that the evidence is
insufficient to sustain the convictions. The elements of the
crime charged in G. L. c. 265, § 25, are outlined in *Common-
wealth* v. *Pelligrini*, 283 Mass. 300, 303: "The essential
factors which constitute the crime alleged are, as stated in
*Commonwealth* v. *Snow*, 269 Mass. 598, 608, '(1) a malicious
threat (2) made to a named person (3) of personal injury to
some one (4) with intent to extort money.' " A malicious
threat of bodily injury is criminal even though intended to
force the payment of a just debt. *Commonwealth* v. *Coolidge*,
128 Mass. 55, 59. Further, the threat is to be tested ob-
jectively; the state of mind of the person threatened is not
controlling. *Commonwealth* v. *Corcoran*, 252 Mass. 465,
483–484.

As to count 1, the defendant argues that of the elements
comprising the crime only that of a "named person" is
proved. He bases this argument chiefly on a definition of
the phrase "crap out" taken from a dictionary of American
slang, pointing out that neither of the two definitions given
connotes infliction of personal injury.[1]

It is not, however, the dictionary definition of the words
used that is determinative, but the words themselves and
the circumstances attending their use. They might mean
one thing in the abstract and quite another in a context of
the sort here involved. We think that the meaning and in-
tent of the words used was peculiarly a question for the jury

---

[1] "1. To lose; esp. to lose one's money or a bet. From dicing and gambling
use in the game of craps, in which a throw of 7 or 11 in attempting to make a
point causes the player to lose his bet and his turn. Not common. 2. To
evade one's duty; to become afraid, to become cowardly; to withdraw from
a plan or excursion; specif. to become too tired to continue enjoying, con-
tributing to, or staying at a party or social gathering. Wide student use
since c. 1945 and most common use." Dictionary of American Slang, Went-
worth and Flexner (Supp. Ed.) p. 128.

to determine. We are also of opinion that it was for the jury to decide whether the threat was made maliciously and with the intent to extort money. Therefore, there was no error in the judge's refusal to grant a directed verdict on count 1.

Najarian's testimony that he did not know the meaning of the words "crapped out," and that he was not in fact threatened, might properly have been disregarded by the jury. We conclude this because of his apparent hostility toward the Commonwealth which prompted the judge to permit the district attorney to put leading questions to him. Only the defendant's state of mind is important. In concluding that the defendant intended to threaten Najarian the jury could have properly also considered the defendant's physical appearance, the fact that he brought the big, bald-headed man with him each time he came, the type of language used, and the defendant's inflection and phrasing in the tape recording admitted in evidence as an exhibit.

As to count 2, the defendant contends that since he remained silent while the unnamed "big, bald-headed man" made the threat, he should not be held criminally responsible for them. The Commonwealth's position is that the jury were warranted in finding a "joint enterprise" based on the evidence that the two were together every time they came to Najarian's house; that on the occasion of the first threat, the defendant spoke while the bald-headed man was silent; that on the occasion of the second threat, the defendant made the telephone call which preceded the bald-headed man's threat; and that the defendant made no effort to dissociate himself from those threats. We agree. See *Commonwealth* v. *Stasiun,* 349 Mass. 38, at 49, and cases cited.

4. The defendant argues finally that he was entitled to directed verdicts because the proof on neither count conformed to the particulars. We are of opinion that this contention is without merit. Even if we agreed that the alleged variances are significant, it is difficult to see how they could have prejudiced the defendant in the preparation of his case for trial. We find support for this conclusion in the fact

that the defendant made no claim of any prejudice at the trial. Decisive, however, is that he appears to be raising this point here for the first time. This he cannot do. *Donahue* v. *Dal, Inc.* 314 Mass. 460, 463. He did not, so far as the record shows, bring to the attention of the trial judge his claim of variance, nor was there anything in his motion for directed verdicts that indicated that it was based on a variance. This failure deprived the Commonwealth of any opportunity to move to amend its bill of particulars which it would otherwise have had under G. L. c. 277, § 40. See *Weiner* v. *D. A. Schulte, Inc.* 275 Mass. 379, 385.

*Judgments affirmed.*